Good morning. May it please the court, Vanessa Williams-Cruz for Plaintiff Reynald LaPuebla. I'd like to reserve three minutes for rebuttal. Two years ago, this court vacated summary judgment against Mr. LaPuebla on his hostile work environment claim and remanded with two instructions. Those were to apply Ellison's inverse relationship between severity and pervasiveness and to consider the record under Okinawski v. Garland and apply its holdings. The district court did neither and granted summary judgment against Mr. LaPuebla again. Now, this court reviews this de novo and the question is narrow. It's not whether Mr. LaPuebla wins, but whether a reasonable juror could find his workplace objectively hostile and one plainly could. Now, there are two main reasons I'd like to discuss today why the district court concluded otherwise. Well, you left out some of that. They also say in Okinawski that the required level of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct, right? That's correct, your honor. And you cited the first part of the quote, but not the second part of the quote, which is your toughest part, isn't it? The second part is being the severity and pervasiveness, so the totality of the circumstances, your honor. The severity or seriousness varies with the persuasiveness or pervasiveness or frequency. Right, and that's what the district court thought when it adopted the first panel's dissent, but the mistake or the error was that it didn't apply the totality of the circumstances and that is the mandate of the president Okinawski and all the president relied on going back to Ellison. Which circumstances did the district court not consider? Well, first, the medium on which the harassing conduct initially took place. It's a Facebook page. It was private to members of the agency. It was viral. There were about 11,000 members. It was created in March 2016 and it was run by an agency supervisor official. You can only come into this Facebook page if you're a CBP employee. Now, one month later, Mr. La Puebla was conducting field training within his office in Port of Guam and the field training officer had taken a couple pictures of him. Sure, I understand that, but I guess on the point of the, I guess, so you're claiming that the fact that it's on the social media goes to the totality of the circumstances rather than the severity of their pervasiveness? That's correct. In order to determine how severe or pervasive the conduct is and what effect it has on the work environment such that it's hostile or that a reasonable person can find it hostile, you have to look at the totality of the circumstances. Where, what elements of the social media posting here do you claim go to either the severity or the pervasiveness? The elements of the social media posting or the nature of the medium of the social media posting goes to pervasiveness. Now, Ellison instructed that severity and pervasiveness, when analyzing this, there's an inverse relationship. The more severe it is, the less pervasive it has to be. And the more pervasive it is, the less severe. Okay, so pervasive. And so most of, usually, pervasiveness is understood as recurrence, right? So that's usually the sliding scales. If it's one instance and it's really severe, as a classic example, it need not be particularly pervasive. It can happen just once. Whereas if it's moderately severe, you do need to show that. And in this case, how long was the Facebook posting up? The Facebook, well, that remains in question. So the post itself on that Facebook page is somewhere in the range of a week. But when we talk about the case... Remains in question, is there something in the record you'd point us to that suggests that it was up beyond a week? Beyond the week, I can point you to the dispute in the dates of the week. Okay, but we're talking a week, give or take. The dispute was somewhere, you know, it was a dispute as a matter of days. Okay, so if we ever held that conduct of any... Where would I look to find that conduct of any severity that persists for a week satisfies our pervasiveness standard? Well, respectfully, Your Honor, the question is separate. It's not conjunctive. It's severe or pervasive. And yes, there's a sliding scale. But you told me that because it's on social media, we should be looking at pervasive. Correct. Let's isolate the pervasive question. Correct. Have we ever held that conduct that continues over a week is sufficiently pervasive? Your Honor, not that I found, but the duration is not pervasive. Pervasive isn't just frequency or duration. Pervasive is about effect. It is about effect on the workplace and it's about reach. And here, in these circumstances, when you look at Okinawski, we're not talking about some offhand comments or to a few coworkers on their private Instagram page. Here, in this case, we're talking about posts to 11,000 colleagues within the agency. Go ahead. You've mentioned Okinawski a few times and I'm not sure I understand how it helps you. So there, you had a whole series of comments that were, you know, so graphic and disturbing that the opinion didn't even quote them. So, I mean, we don't know exactly what they were, but they were something pretty serious. Here we have a single post that, I mean, it is what it is. It was up for a week. It doesn't really seem comparable to the kinds of posts that were at issue in Okinawski, does it? Yeah, we acknowledge that Okinawski is distinguishable on its facts, but we're invoking and the court was instructing to apply its method, not its facts. I did note that there were some similarities. Now, in this case, we have a reach that's far beyond just what was in Okinawski. And how do we, what would you, how would, what quantity, what metric should, would you have us use for reach here? I don't believe that there's a quantity and I think that the totality of the circumstances operates as a limiting principle as opposed to having some bright line rule in quantity or frequency. How many, based on the, what's, what's your read of the record in terms of how many other employees encountered the photo? 11,000. If we're taking out all- And where would we, where would we know that? Because we have, we have different, we have, we have comments, we have likes, and then we have the total subscribers to this, this page. And 11,000 is the total number of subscribers to the page? Members of the group, correct. Members of the group. How do we know that, then that, that 11,000 people saw this? Well, that's the inference to be drawn from a social media post and that's what Okinawksi said, is that when you have a social media post, when it's posted online, it's permanently or infinitely viewable and reviewable. Okay. And you want to quote that quote every time. I was some concerned about that quote, because as I read your quote, social media posts are permanently and infinitely reviewable and re-reviewable by any person with access to the page or site on which the posts appear. But when I read Okinawski, that, that language doesn't refer to whether, was refer, doesn't refer to what you want it to refer to. Rather, it referred to whether the social posts occurring outside of the workplace should be considered in the totality of the circumstances when evaluating the whole hostile work environment. Seems to me you borrowed that quote to make it stand for a different idea than Okinawski ever thought it was going to meet. And that's the thing that worries me about that. Your Honor, I acknowledge that it's a, it was addressed in the context as an inference to start discussing where the conduct occurred, but where the conduct occurred goes to reach under the totality of the circumstances. How far did this reach? Now in Okinawski, they were arguing, oh, well, this is online, so it doesn't reach the workplace. This isn't related to the workplace. And so that's the, that's the concept that we want to draw from here and the inference that should be taken. And on summary judgment, the inferences have to be drawn for the non-movement. Ms. Cruz, I guess I'm trying to figure out the, I guess the problem with the, one question about the reach is, I think perhaps you're contending that an inference could be drawn that everyone on Facebook tuned into this page and saw it, tuned in is a little bit of how can we take the photo itself in isolation? I mean, I take that the offensive conduct here is a complex of the photo, which is just a picture of the exercise, plus the comments. And the comments, there are fewer than a dozen of those. So in terms of understanding, are you contending that just the photo is what we should be looking to for severity when we compare it to the 11,000 member reach for pervasiveness? No, and for two things. We're not, we're not looking at just one photo. We're looking at two photos, but that's not the only limit. And we're not just looking at the comments, but we're not also, we're looking at pervasiveness. And so the totality, what we're looking at is that we had a field training officer who agency literature says is supposed to be an example by following policies and regulations. He broke those policies and regulations by taking pictures of the field training exercise and posting them to social media. So that itself alone was a violation of the rule. Then when he posted it, there was all this innuendo in which he was engaging and fomenting and attacking, you know, acute, implying that he was sodomizing another agent, you know, federal officers and enjoying it, identifying the other agents. So there was a lot of back and forth. Then this reach went to his other colleagues. Now my client, he found out from his other colleagues because they said there's this post or this thing that's gone viral. And so that is the reach that we're talking about. The totality of the circumstances looks beyond that, not just those factors, the two posts, the likes, his coworkers laughing, but also the agency response. So that is not just a question for liability of the employee. Let's look at the agency response. It seems to me the agency's response here, if we're to look at the agency's response to the hostile harassment in the agency, the post was removed within a week. Well, it was debatable within a week. And at the time, Lo Pueblo, your client didn't even know about the formal letter of reprimand issued to Cuinga, correct? The formal letter of reprimand issued four months later. But as I understand, looking at the deposition testimony, your client didn't even know about a formal letter of reprimand, which was issued to Cuinga. And that's correct, and that's telling. That means there was a formal letter of reprimand issued. That means the post was removed within a week. That means that the agency did have a response, didn't it? That means they had a response, but it doesn't mean they had an effective and prompt response that was sufficient not only to stop that harassing conduct, but to deter future misconduct. And the record also shows that this page itself was ordered, the watch commander who was in charge of this page, wasn't reprimanded until four years later for an order to take the page down, which shows that the conduct, this type of harassing conduct, continued within the agency for four years. They condoned it. They didn't do sufficient reprimand. They ignored the rules and regulations. Ms. Cruz, we spoke at length about the pervasiveness, but I just wanted to, before you sit down, ask you about the severity. So I understand that this was what happened at work and the posting was offensive to your client. What case would you have us look at to calibrate the level of the severity side of the balance? Because we've several cases on summary judgment that involve quite offensive, teasing, harassment, and other things that we have said as a matter of law, drawing all inferences in favor of the plaintiff, don't amount to severity. So where should we look to figure out where this fits in? Absolutely. I'd start with Ellison. The Ellison case, which the court cited to, in that case, we were talking about two love letters to a co-worker. And there, the court of appeals decided that even though they were two love letters, and maybe from the harasser's intent, there was nothing wrong with it, it obviously pervaded or had an effect on her work environment. Quite pervasive and persistent, right? I think the thing that sticks out about Ellison is just how persistent. So is your contention that if that had happened just once over a period of a week, that that would be sufficiently severe to warrant the denial of summary judgment? No, your honor. That's not what we're contending. That one post or one love letter, if that's what the court referring to, would be sufficiently severe. And that's not what Ellison found either. Ellison was looking at specifically from the perspective of a reasonable person in the victim's circumstances. And so if we're to take that here, we're talking about men in law enforcement. We're talking about disparaging language related to sex and perceived sexuality. And so when we go back to Ellison, it's interesting because there's a quote in there that talks about the severity falls somewhere between forcible rape and like mere utterances. And that giant span is where the conduct of Gray in the Ellison case fell here. And here we have Mr. Puebla conduct with its reach and with its employer response. This and the other circumstances, this is far beyond two love letters. These weren't sweet, you know, weird or in the court's word, bizarre love letters. These were in fact sexually disparaging posts that were disseminated throughout the entire agency. Thank you. You've used up your time. We'll give you two minutes for rebuttal. Thank you, Your Honor. Your Honor, Michael Schwab on behalf of the United States, and I thank you for letting us be here today. I appreciate that you've come from the mainland to Hawaii to meet us halfway. And I would like two minutes, if I may, for my rebuttal. You don't have a rebuttal because there's no cross-appeal here, right? You're just the appellee, so you have your time now. But thank you, Your Honor. And I really am happy to be here today. I think the Okanowski case was groundbreaking. It actually told employers that they have an obligation to get out from behind their desks and learn what's going on with their employees, even outside the workspace. That's also a dangerous territory to be treading. And I think employers have to do that balancing act. They have to be vigilant but not overbearing because people do have a right to their outside life and their teasing and their... Well, what about this was outside life? I mean, compared to Okanowski, this was a Facebook page that was run by employees for employees. It was a Facebook page that had been started three weeks earlier by a GS-13 in Orlando, another port of authority. And it was popular. People want to communicate. They want to communicate about work. And in the old days, we would go to a pub and people would all come in there and get a chance to talk about what happened at work. Now we do it online. So this is the modern age. And in Okanowski, I think the court really stepped into that and said, this is the modern age and employers need to step up. And if you look at what happened here in the La Puebla case, that's exactly what happened. It's the juxtaposition for what occurred in Okanowski. In Okanowski, the warden just let someone else handle it. Here, the port director himself immediately responded when he learned about this. And he went about methodically trying to figure out and being careful because you have to be careful. This is not a penal statute where you have a criminal. You have to respect everyone's rights. And he went methodically out and gave a letter of instruction. He then had ultimately a three-page letter admonishing him and putting it in his record. But I guess to take the pub analogy, your friend has said that asked us to draw an inference or that the district court should have drawn an inference that you had 11,000 co-workers there. So that seems more like an arena of co-workers being shown a slideshow of this offensive photo. Why doesn't that kind of take us off the charts in terms of the level of pervasiveness in a way that this severity would get the plaintiff past summary judgment? Again, it speaks to the genius of Okanowski in that you address the modern world, where when things happen, like when I go on family vacation, it ends up on WhatsApp. And if you Instagram my nephew, you can participate as well. In this case, we have 63,000 employees. They're the largest group of uniformed people in the world. And 11,000 of them immediately signed up and said, yes, let's look at this. Yes, let's talk about work. That puts an obligation on the employer. This was 2016, and the employer took that obligation. The court director himself jumped in. You've mentioned a number of times what the employer did. But I understood your first line argument to be that that doesn't really matter, that even if the employer had done nothing other than, I suppose, make sure that the post was taken down after a week. A post like this for a week is simply not severe or pervasive enough to be actionable, even in the absence of any remedial steps by the employer. Is that your position? I'm not sure I'd go that far, and this is why the totality of the circumstances is so important. The totality here, it's not that pervasive. Somebody took a picture of three people in what they call the clinch, which is a very intense exercise where you learn to not use your gun, but actually use your body to throw over somebody who's taken over and sitting on top of you. It's a source of tension because employees have to climb on top of each other. When you said you wouldn't go that far, is it your view that all the facts are the same except that the reason it gets taken down is just Mr. Cuenga, totally his own decision, and no supervisor tells him to take it down, no supervisor does anything? In that situation, do you think that this would be enough to survive summary judgment? I think we could still argue that it's not, and that's because of the circumstances that you see here. Are you arguing that? You could argue that, but is that your position? I'm taking the totality. I'm using Okonowski as the guide, where you have to look at everything. If you look at everything, you start off with a picture of three people in the clinch. Somebody says that he must be enjoying himself, and there's laughing emojis. Then the person who posted it, the original poster, joins in and says, yeah, I didn't teach him that move. That's wrong. That's a violation of all of the training that that person had gotten. There's an employer obligation to step out and say you did that outside of work, but it's affecting work. Is that severe? Is that far over? I take it that you can look at the totality of circumstances, but it's overlaid on the Supreme Court's test of severe and pervasive or hostile work environment. Assuming it's up for a week, is that complex of the photo plus the comments severe enough, and why not? Severity can be in the eye of the beholder. Well, this is summary judgment, so this is severity as a matter of law in the eye of the courts. It is not so severe, Your Honor. Could you use the rational person test that the court has used so often, and you look at this and say, would a rational person be affected in their workplace by the fact that somebody made laughing emojis and implied that maybe they were enjoying being in this exercise because it's male-on-male? Okay, but there are other things that worry me about what happened at the time. Yes, Your Honor. Cuenga confronted La Puebla in the bathroom in an attempt to apologize. He did, Your Honor. Mentally, excuse me, management initially emailed Cuenga and downplayed the incident, saying, I'm sure there was no ill intent on your part when posting the pictures and the comments. After submitting the complaint, the supervisor yelled at La Puebla, do your job. And then after submitting the complaint, the supervisor said he considered everything that was written was frivolous. Now, is that evidence together enough with what we've had in front of us today, enough to survive summary judgment, create a triable issue of fact? No, it doesn't survive summary judgment, and let me tell you why. It's the context, Your Honor. What you have here is a layer of management that's now being told they have to get involved. Okonowski says you have to get involved, even when it's outside the workplace. So you have the port director himself going after an investigation. Three tiers down, you have a person who's directly involved with the employees every day, and he's trying to keep this calm. He's trying to keep this from becoming a hostile atmosphere. People taking sides. One side saying, oh, that's too severe. The other side saying, we were just laughing. They're trying to walk that tightrope, and that tightrope's important. And that tightrope should be respected by the courts and by, of course, in the Okonowski case, where they give them that responsibility to get out on that tightrope, try to make sure that things don't permeate the workplace. And that's what you see the struggle here, when someone calls him and says, what's happened with that guy that posted my picture? I want him to be punished. And he says, do your job. Do your job, Ray. And he said, wow, and yelled at me. I think that's appropriate to say, trying to keep them focused, that this is not going to become a workplace hostility problem. And it wasn't. This occurred, it ceased, and it didn't reoccur. And I think that's the most important. Employers take a big risk when they step into this arena. They could be violating the rights, you can see in Swinson v. Potter, where it talks about when an employer steps in where two co-workers are, one is accusing the other, or one has abused the other. Then the management's in a precarious position. They've got to balance things. And I think we have to give some deference to the management in this case, which did a very good job. Was any, I mean, I think this is a challenge that I think Okonowski might recognize. Certainly, we may face. No record of any disciplinary action taken against the other commenters who also posted offensive comments there. No, and welcome to the internet. Do we know who those people were? That's a struggle. You've got 11,000 people. But they're all employees of the agency, by definition. Employees somewhere operating on the internet. They're not registered with the agency. Nobody knows who they are. You get to go on the internet, and you get to express yourself. Now, the employee who posted these pictures, he did use his name. So we could identify him immediately. He wasn't trying to say. In fact, he was trying to show pride. That's what, that was his testimony. And I think it's credible that he did this training that's very difficult. He posted it online. He wanted people to see it. And if he just hadn't encouraged a negative comment, we'd be in a totally different case today. Well, I guess that's, I mean, even if it's a little, I take your point that it's not sufficiently severe within a seven-day window if it happened once. But if we think of the pervasive side as the number of recurrences, again, back to your point, this is no longer a pub. This is an arena where you can look at the recurrence as there were 100 or so likes, right? There were. And so that's a lot for a hostile environment claim. And if we draw the inference that there are 11,000 views, that there could be as many of those views, it's hard to find other cases that involve that many recurrences of the offensive conduct. Why shouldn't we look at it that way? I think, and you can see it in Okanoski, the modern age. We're no longer going to the local pub. We're no longer giving a phone call at night. We're putting things online. And online has that automatic potential for broadcast. I think that's unavoidable. And the employer is not responsible for that. That's the modern world. We no longer make a phone call at night or put up something on a bulletin board. We put it up online. And in this particular case, it was put up- appeared to draw a distinction and said, well, there are 11,000 people online. But to not draw the inference that the plaintiff is asking us to draw here, it received only 11 comments. And again, a sufficiently severe conduct that is where 11 other employees join in, the content, I think, would kind of move the needle quite a bit on pervasive. There's also less than 1% of the members interacted with it. Well, it's 1% of 11,000. So you've now got 100 people joining in, according to the analysis or what inferences we should draw, the pervasiveness of the conduct. I guess I just don't see why that's enough to amp up the balance enough to get it over the line past summary judgment. I don't think it is appropriately or invasive enough, pervasive enough. Anyone, anywhere, in an office, in a chamber, in a family, can post a photo. And it happens that people can see it. That itself can't be pervasive. If that's pervasive, then everything that happens from now on in a workplace that involves a picture online is automatically pervasive. Would it make a difference if the record established that the people who engaged with the post and commented on it, the 100 people, were all co-workers? That would be interesting. And it would be a fact that we couldn't uncover. But I would say that it would be a factor, yes. These are all just people in his little circle. But again, and this goes to part of the totality, the severity. These are people that had laughing emojis. These weren't people that said, that guy. You know, they're somehow targeting that person. Like they did in Okinowski. But the laughing emoji, I mean, I don't understand how that's not targeted. The emoji is directed at the picture, which is of him. So maybe it's not very severe because it's, you know. It's a picture of someone. Gradation of emojis. But they're looking at a smile in a tense situation, something they relate to. They all have to do this training. And they make fun of that. They're not directing directly at him saying, oh, that guy. I work with him. He's horrible. You know, the way you see it in Okinowski, that's a direct threat to her. That is a battle with her. And they use the internet to bring that battle to fore. And you don't see that here. Nobody's battling. They're laughing. And it's inappropriate. And it's disrespectful. And it violates the rules of using social media. Now, this is 2016. We've gotten more sophisticated since then. We now have Okinowski. So I think it would be even a larger breach today. But it's not so severe. And it's not so pervasive that it alters the workspace. And be reminded that the only person that can alter that workspace is the employer. Only the employer, by either their tolerance or by their actions, can change the factors of the workplace such that it becomes hostile. And that didn't happen in this case. You have management operating like a team. You've got the director himself. You ask yourself, if the warden had jumped in at Okinowski, what a difference that would make. The director himself. You're over your time. Thank you so much, Your Honor. I appreciate it. Thank you. And thank you again for coming here. I'd like to address the employer's conduct because it is part of the totality of the circumstances analysis for whether there was a hostile work environment. Now, it's the existence of past harassment, every bit as much as the risk of future harassment that Title VII intends to condemn. And here, the employer's response was inadequate. It only addressed the past misconduct. It did nothing to deter future misconduct. The reprimand wasn't in the case. It issued until four months later, and it was the lowest possible reprimand of the scale. If we look at the letter of reprimand, he said the letter of reprimand will stay in your file for 18 months when he had a potential suspension up to 14 weeks. I take your point, although there's nothing in the record suggesting that there's been any repeated recidivism of any kind here. I wanted to ask you a different question. Do we know how many of the comments or likes are from local co-workers, and should that matter? The answer to both questions is no. We don't know how many were immediate co-workers. We know at least one. We can infer at least one when he said, is that so and so? And he said, yes, it is. But we're talking about an employer. And the employer employed and the agency's own words, 60,000 people, 11,000 of which were members of this group. Do they use pseudonyms on the page, or are they posting in their real names? It would appear so, because Quingra self-identifies himself as Maximus something. So at least from there, I would see that there were pseudonyms. But your honor, I would like to address the point that because there is, that you first made, that there is something in the record that shows there was recidivism, that there were future posts. And that's at 2ER166, when we had an order four years later for that page to be taken down. Now, recalling Title VII's purpose is to deter future misconduct, similar future misconduct. This is about the employer's environment, the workspace, not just this past incident. But with respect to the reprimand that was given to him, it was even removed early. So Quingra was supposed to have that letter on file for 18 months. Instead, what he got a promotion and removal of the letter of reprimand six months early, so he could be considered for another promotion. And this is in Cuchara's own declaration. We would submit that's not effective to deter future misconduct. He was rewarded. He was praised. Really, it wasn't even a slap on the hand for him. Not immediately, when the post went up, they took five days to say, hey, in case you did this, even though it was visible, don't do it anymore. And then four months later. Thank you, counsel. You're over your time. I'm sorry, your honor. No, thank you. Thank you. We thank both sides for their helpful argument, and the case is submitted.
judges: SMITH, MILLER, JOHNSTONE